**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) STONEY M CURRIN, II, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   CASE NO.: CIV-23-22-F |
| | ) |
| (1) OKLAHOMA COUNTY CRIMINAL | ) |
| JUSTICE AUTHORITY, | ) |
| (2) BOARD OF COUNTY COMMISSIONERS | ) |
| FOR OKLAHOMA COUNTY, | )   Attorney Lien Claimed |
| | )   Jury Trial Demanded |
| Defendants. | ) |

## <u>COMPLAINT</u>

**COMES NOW**, the Plaintiff Stoney M. Currin, II, and for his Complaint against

the above-named Defendants, states and alleges as follows:

## <u>PARTIES</u>

1.      Plaintiff Stoney M. Currin, II ("Plaintiff" or "Mr. Currin") is an individual

and a citizen of the State of Oklahoma.

2.      Defendant Oklahoma County Criminal Justice Authority ("OCCJA" or "Jail

Trust") is a public trust created for the furtherance of purported public functions pursuant

to 60 Okla. Stat. § 176, *et seq.* OCCJA was created by a certain "Trust Indenture."  Under

the Trust Indenture, OCCJA is to "assist" Oklahoma County in its stated objective of

operating the Oklahoma County "Jail Facilities", which includes the Oklahoma County

Detention Center ("Oklahoma County Jail" or "Jail"). Under the Trust Indenture, OCCJA

was delegated the responsibility of developing policies and procedures to address the

administration of the Jail. However, the Trust Indenture specifically provides that the

Oklahoma County Sheriff was to continue operating the Jail until such time as the OCCJA and Oklahoma County had entered into a lease agreement and/or funding agreement(s) that specifically provided for the OCCJA to commence responsibility for management and operation of the Jail. OCCJA did not take over responsibility for management and operation of the Jail until June 1, 2020. However, since June 1, 2020, OCCJA has remained the County entity with primary responsibility for the management and operation of the Jail. The Oklahoma County Sheriff and a member of the Oklahoma County Board of County Commissioners are permanent members / trustees of the OCCJA.  OCCJA is sued as a successor County entity under Plaintiff's municipal liability theory.

3.       Defendant Board of County Commissioners for Oklahoma County ("Board", "BOCC" or "Oklahoma County") is the legislative entity with non-delegable statutory responsible for providing a jail facility for Oklahoma County, Oklahoma that is adequate for the safe-keeping of inmates at the Jail. *See* 57 O.S. § 41. As a matter of Oklahoma law, BOCC exercises the powers of the county. *See* 19 Okla. Stat. § 3. A suit brought against BOCC is the way Oklahoma law contemplates suing the county. *See* 19 Okla. Stat. § 4. BOCC is charged with ensuring that the Jail has adequate funding and resources to provide constitutionally sufficient conditions of confinement.

## JURISDICTION AND VENUE

4.       The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and/or Fourteenth Amendment(s) to the United States Constitution as enforced by 42 U.S.C. §

1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under the color of law.

5.      This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and/or Fourteenth Amendment(s) to the United States Constitution and 42 U.S.C. § 1983.

6.      The acts complained of herein occurred in Oklahoma County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## FACTUAL BACKGROUND

■ **Facts Specific to Mr. Currin**

7.      Paragraphs 1-6 are incorporated herein.

8.      In January 2021, Mr. Currin was a pretrial detainee at the Oklahoma County Jail.

9.      Mr. Currin was just 19 years old at the time.

10.     Mr. Currin has long suffered from serious mental health conditions, including Bipolar disorder.

11.     Beginning in October of 2020, Mr. Currin exhibited signs of severe psychosis and he was placed in the Jail's "mental health unit."

12.     During his time in the Jail, Mr. Currin was routinely harassed and ridiculed by Jail staff.

13.     On or about January 10, 2021, Mr. Currin was taken from his segregated cell to an attorney room.

14.     After being escorted from the attorney room back to his cell, Mr. Currin was confronted by two detention officers, both employees and/or agents of OCCJ/Oklahoma County. Both of these officers were acting under color of law.

15.     At a time when Mr. Currin was shackled, and effectively subdued, and posing no threat, Mr. Currin asserts that he was struck in the back of the head by one (or both) of the officers with great force.

16.     In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), the United States Supreme Court held that a claim of excessive force brought by pretrial detainees under the Fourteenth Amendment is governed by an objective standard of fault. In doing so, the *Kingsley* Court abrogated federal appellate precedent that applied a subjective Eighth Amendment standard to such claims. *Kingsley,* 135 S. Ct. at 2472. The Court explained that language of the Due Process Clause and the Eighth Amendment differs and that "pretrial detainees (unlike convicted prisoners) cannot be punished at all." *Id.* at 2475. Therefore, when analyzing an excessive force claim by a pretrial detainee, "the relevant standard" to determine excessiveness "is objective not subjective." *Id.* at 2472. In other words, "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.*

17.     In applying this objective standard, courts are to view the facts and circumstances of the case "from the perspective of a reasonable officer on the scene," considering the following non-exhaustive factors:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

4

*Kingsley,* 135 S. Ct. at 2473 (citing *Graham v. Connor,* 490 U.S. 386, 396 (1989)).

18.     Applying these "*Kingsley* factors" here, it is clear that the detention officer(s) use of violent force on Mr. Currin was excessive and objectively unreasonable.

19.     First, under the circumstances, because Mr. Currin was subdued and posing no threat, there was no need to use *any* force, let alone application of violent force to the back of his head.

20.      Second, the extent of Mr. Currin's injury is significant and continuing. He was hospitalized in the Intensive Care Unit ("ICU") on January 10, 2021 for subarachnoid hemorrhage (due to blunt force trauma to the back of the head), hypothermia, shock and acute encephalopathy. He had a massive laceration on the back of his head, where he was struck. He was intubated and in a coma. He remained in the ICU until February 2, 2021. Since the incident, Mr. Currin is permanently disabled.

21.     Third, prior to using excessive violent force on Mr. Currin, he asserts that the officers made no effort whatsoever to temper or to limit the amount of force.

22.     Fourth, Mr. Currin presented no "security problem" at the time the use of force occurred.

23.     Fifth, the detention officers could not have reasonably perceived any threat from Mr. Currin.  At the time of the use of violent force,  Mr. Currin was unarmed, outmanned and subdued. He posed no threat to the officers.

24.     Sixth, Mr. Currin asserts that he was not actively resisting when he was struck in the head.

25.     Overall, the analysis under *Kingsley* weighs heavily in Mr. Currin's favor.

26.     As a direct proximate result of the detention officer(s)' unlawful conduct, Mr. Currin has suffered actual and severe physical injuries, extreme physical pain and suffering, emotional and mental distress and damage, as well as permanent disability.

■ **County Policies and Customs**

27.     Paragraphs 1-26 are incorporated herein.

28.     There is an affirmative link between the aforementioned unconstitutional acts of the detention officer(s) described above and policies, practices and/or customs which Oklahoma County/OCCJA promulgated, created, implemented and/or possessed responsibility for.

29.     To the extent that no single officer violated Mr. Currin's constitutional rights, Oklahoma County/OCCJA are still liable under a theory of a systemic failure of Oklahoma County/OCCJA policies and procedures as described below. There were such gross deficiencies in staffing, facilities and procedures that Mr. Currin was effectively denied constitutional conditions of confinement.

30.      A "Lieutenant Brewer" at the Jail previously used excessive force on at least two other inmates, Jazmine Miller on August 6, 2020 and Dakota Simco on May 23, 2019.

31.     On the evening of August 6, 2020, Ms. Miller was taking a shower at the Jail.

32.     Lieutenant Brewer, a male supervisor at the Jail, approached the shower area, responding to allegations from a female officer that Ms. Miller had refused a verbal order to return to her cell.

33.     After arriving at the shower area, Lieutenant Brewer delivered several closed fist punches to the face and body of the Ms. Miller as she was unclothed and defenseless inside of the shower stall.

34.     Lieutenant Brewer also struck Ms. Miller in the body with his knee and also applied O.C./pepper spray in Ms. Miller's face.

35.     Lieutenant Brewer was subsequently charged with criminal assault and battery in connection with his use of force on Ms. Miller. *See State of Oklahoma v. Brewer,* CM-2020-3272 (Okla. County District Court). The criminal case is still pending.

36.     On May 23, 2019, then-Sergeant Brewer responded to an inmate, Dakota Simco, who, like Ms. Miller, was allegedly resisting a command to return to his cell. At the time, Inmate Simco was seated on a toilet, and asked Brewer for additional time to finish using the restroom before returning to his cell. Brewer counted to three, and then placed handcuffs on Simco's right wrist. Simco then stood up from the toilet, and wiped his buttocks.

37.     Brewer struck Simco in the head with a closed fist while holding his handcuffs. Inmate Simco fell against the cell wall, and Brewer struck him a second time in his ear as he fell to the floor. Inmate Simco required 12 staples in his scalp to close the wounds.

38.     On information and belief, Brewer was not disciplined by Oklahoma County officials for his use of clearly excessive violent force on Inmate Simco (despite the County's knowledge of the incident), until after the incident involving Ms. Miller came to light and was forwarded to the District Attorney. In fact, Brewer was promoted to the rank of

Lieutenant after assaulting Inmate Simcoe and was retained as a County employee until after the incident involving Ms. Miller occurred in August of 2020.

39.     The Simco and Miller incidents, both involving the same supervisor at the Jail, Mr. Brewer, evince a practice of using excessive violent force to quell passive resistance. The County's failure to take any remedial measures after the Simco incident is evidence of an acceptance and tolerance of unconstitutional excessive force, failure to supervise and deliberate indifference to the safety of inmates like Ms. Miller.

40.     The Simco and Miller incidents are symptomatic of a much larger problem.

41.     The systemic deficiencies at the Jail are long-standing, dangerous, and unabated.

42.     From its inception in 1991, the Jail has been systemically deficient. Overcrowding, under staffing, inadequate security and supervision, excessive use of force by staff and assaults have been constant.

43.     Following a lengthy investigation, in 2008, the U.S. Department of Justice issued a report on conditions of confinement at the Jail. The DOJ found woefully inadequate supervision and staffing at the Jail, a lack of basic medical and mental health care, overcrowding and a high rate of inmate assaults and deaths.

44.     Since 2008, the Department of Justice has been identifying deficiencies at the OCDC including: a. overcrowding; b. physical layout of the facility prohibiting adequate sight and sound supervision; c. an inordinately high risk of violence due to inability to properly supervise; and d. inadequate staffing numbers.

45.     From at least 2008 to present, BOCC has failed to provide sufficient oversight and funding of Jail. Due to the documented dangers at the Jail, including DOJ's finding of inadequate supervision and staffing and a high rate of inmate assaults and deaths, in 2009, BOCC entered into a Memorandum of Understanding with the federal government. Under this Memorandum of Understanding, Oklahoma County was to adequately fund and staff the jail by 2014, or face court action from the federal government to force compliance.

46.      As of August 2020, Oklahoma County had plainly not complied with the requirements of Memorandum of Understanding with the Department of Justice.

47.     From at least 2008 to present, chronic shortage of detention officers and the facility's flawed design have made it impossible to adequately supervise the Jail.

48.     Documented insufficient staffing levels and the poor condition of the 30+-year-old jail building have contributed to high death rates and a lack of basic rights for inmates at the Jail over the past decade.

49.     At the time of the incident involving Ms. Miller, the Jail employed fewer detention officers to supervise inmates than it did in 2008.

50.     Simco and Miller were both able to leave their cells at unauthorized times due to chronic and longstanding gross deficiencies in staffing, procedures and facilities.[1] Because of the gross lack of staffing and security at the Jail, inmates and detainees were

---

[1]     For instance, at all pertinent times, cell doors throughout the Jail were faulty and could be easily opened by detainees enabling them to move around freely in the housing units.

often free to roam Jail unsupervised. As a matter of practice, the County attempted to deal with this problem, not by increased funding, staffing and training, but by fostering an environment where excessive use of violent force was tolerated and encouraged as a way to "control" the detainee/inmate population.

51.     The Department of Justice required Oklahoma County to fix the locks in 2008 but it wasn't until 2019 that the County installed new locking mechanisms, but only on about 1/3 of the Jail's 1,200 cells.

52.     In February 2021, well after the Simco and Miller incidents, it was publicly reported that Oklahoma County/OCCJA believed it would cost an additional $3.8 million to completely remedy the faulty cell door/lock deficiency at the Jail.

53.     Four (4) other detention officers have been charged criminally for uses of excessive force on inmates who left their cells to shower or use the toilet without permission.

54.     Three former detention officers face misdemeanor charges of cruelty for placing detainees in a "standing stress position," a well-known "enhanced interrogation" or torture tactic, and forcing them to listen to the children's song "Baby Shark".[2] The detention officers sometimes used the song as a form of discipline for inmates who left their cells.

55.     Due to inadequate staffing, the "Baby Shark" victims were mostly left alone in their pods. One victim was singled out for punishment after he rigged the old, faulty lock

---

[2]     Though these incidents occurred in 2019, when the Sheriff's Office operated the Jail, the Jail Trust is the successor entity for the purposes of municipal liability and BOCC has remained responsible for the Jail during all pertinent time periods.

in his cell so he could walk freely around the jail pod, shower and use a toilet with more privacy than the one in his shared living area.

56.   As summarized in the Probable Cause Affidavits, the blatantly unconstitutional conduct of the "Baby Shark" officers, "Miles, Butler and Hendershott", was open, obvious and repeated. Yet, no one from Oklahoma County stepped in to take remedial action.  This exemplifies a systemic and deep-seated failure to train and supervise, with respect to the most basic aspects of correctional operations and constitutional conditions of confinement. As stated in the Probable Cause Affidavits:

> Upon interviewing DO Miles, he confirmed that he and Butler systematically worked together and used the benches, bars and attorney booth as a means to discipline inmates and teach them a lesson because they felt that disciplinary action within the Detention Center was not working in correcting the behavior of the inmates. Butler also confirmed that he used the booth as a means of punishment. Miles further stated that the inmates often "pissed off" Butler which evidence suggests led to those inmates being taken out of their cells/pods and mistreated. The secure point on the wall was measured as being 3ft from the floor up the wall. At this height and with no chair to sit on, it would have been nearly impossible for most inmates to sit or kneel thus forcing them to stand.
>
> Statements made by inmates and staff also indicated that in addition to the corporal punishment given by Miles and Butler, they additionally worked together and played children's music on a loop to play repetitively aloud while the inmates were housed in the attorney visitation booth thus putting undue emotional stress on the inmates who were most likely already suffering from physical stressors. The playing of the music was said to be a joke between Miles and Butler as confirmed by Miles.
>
> Additional evidence showed that Detention Officers Miles and Butler worked under their direct supervisor, Lt. Hendershott, who ***failed to properly supervise and discipline*** them. Miles and Butler were the subject of numerous inmate complaints that detailed their ***history of mistreatment of inmates*** ranging from retaliation to mishandling of inmate mail. In addition, nearly ***20 hand written inmate complaints*** were received at one time regarding one or both Officers and directly

11

forwarded to their supervisor, Lt. Hendershott. Evidence suggests that no investigation was conducted and subsequently no corrective action was taken by their direct supervisor, Lt. Hendershott. Evidence also showed that when Hendershott first learned of inmate mistreatment by Miles and Butler on 11-23-19, he took no immediate action to either aid the inmate victim or discipline the Officers. ***This appeared to have led to the Officers continuing to mistreat inmates where at least an additional six (6) inmates were physically victimized.***

57.     Another inmate, Charlton Chrisman, died in 2017 after he was shot at close range more than a dozen times with pepper balls by detention officers at the Jail. His family filed a federal civil rights lawsuit. BOCC recently approved a $1.1 million settlement of that lawsuit.

58.     These repeated instances of excessive force reflect Oklahoma County/OCCJA's failure to train and supervise and deliberate indifference.

59.     The unconstitutional failure to protect, lack of staffing and inadequate supervision of the Jail continued to result in tragedy well after OCCJA took over operations of the Jail. In January 2021, inmate Brad Lane was beaten to death by his cellmate. As the beating began, Lane screamed for help. Because of the woefully inadequate staffing at the Jail, Detention officers did not respond Lane's cries for help for almost an hour. By then, it was far too late.

60.     Lane repeatedly screamed "he's killing me, help me, he's killing me!" There was no one there to come to his aid. Another inmate called for help (for Lane) three times from the phone in his cell, but there was no answer.

61.     The Jail Trust retained consultant David Parker to provide recommendations to remedy the continuing deficiencies at the Jail. Parker issued a report

finding outdated training and policies and procedures, a staff consensus is that "every issue that transpires in the jail can be traced to staff shortages", and staff being trained to detect and/or intervene in inmate incidents appropriately.

62.     In May 2021, the National Institute of Corrections provided a report to the BOCC and Jail Trust finding: a. an incomplete staffing plan; b. that new hires receive limited training; c. "[c]lear and convincing present level of staffing was insufficient for a safe and secure jail"; d. it was "[i]mpossible to effectively manage inmate population when they are so short-staffed;" e. that officers were coming to work without proper training; and f. a lack of policies and procedures posted

63.     Oklahoma County/OCCJA plainly failed to adequately train and supervise its officers, in violation of policies and the Oklahoma Jail Standards, including Lieutenant Brewer, with respect to, *inter alia*: use of force, de-escalation, the use of force continuum, appropriate use of force in a correctional setting, use of force on a detainee in handcuffs, cruel or inhumane corrections practices and constitutional requirements for the conditions of confinement.

64.     In finding constitutional liability at the county level, the Tenth Circuit, in *Tafoya v. Salazar,* 516 F.3d 912, 919 (10th Cir. 2008), pointed to evidence of an "undisciplined culture of 'anything-goes' among the detention officers [that] remained unaddressed and unmitigated by Sheriff Salazar, who continued to employ a hands-off approach to jail management." Here, as discussed throughout, the County's "management style" has been "hands-off" at best and describing the culture at the Jail as "undisciplined" and "anything goes" would be charitable.

65.     The County/BOCC/Jail Trust have had abundant opportunity to increase funding which would allow it to properly staff, supervise and train its staff. Its failure to take reasonable measures to alleviate known and substantial risks to inmates like Mr. Currin constitutes deliberate indifference at the municipal level.

## CAUSES OF ACTION

### EXCESSIVE USE OF FORCE
### (Fourteenth Amendment; 42 U.S.C. § 1983)

- **Individual Liability and Underlying Violations**

66.     Paragraphs 1-65 are incorporated herein by reference.

67.     At the time of the complained of events, Plaintiff, as a pretrial detainee, had a clearly established constitutional right under the Fourteenth Amendment to be secure in his person and free from objectively unreasonable and excessive force.

68.     Any reasonable officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

69.     The violent force used by the detention officers, as described herein, was excessive and objectively unreasonable.

70.     As a direct and proximate result of the detention officer(s) unlawful conduct, Mr. Currin accrued significant medical expenses, suffered actual and severe physical injuries, extreme physical pain and suffering, emotional and mental distress and damage, as well as permanent disability.

- **Municipal Liability**

71.     Paragraphs 1-70 are incorporated herein by reference.

72. The aforementioned acts of excessive force by the detention officer(s) are causally connected with customs, practices, and/or policies which Oklahoma County/OCCJA/BOCC promulgated, created, implemented and/or possessed responsibility for.

73. To the extent that no single officer violated Mr. Currin's constitutional rights, Oklahoma County/OCCJA are still liable under a theory of a systemic failure of Oklahoma County/OCCJA policies and procedures as described below. There were such gross deficiencies in staffing, facilities and procedures that Mr. Currin was effectively denied constitutional conditions of confinement.

74. Those customs, practices, and/or policies are outlined in Paragraphs 27-65, *supra.*

75. Oklahoma County/OCCJA/BOCC knew, must have known or should have known that, by maintaining such customs, practices, and/or policies, detainees like Mr. Currin were at substantial risk of harm. Nevertheless, Oklahoma County/OCCJA/BOCC failed to take reasonable measure to alleviate the risk of harm.

76. Oklahoma County/OCCJA/BOCC, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to citizens', including Plaintiff's, health and safety.

77. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Plaintiff suffered injuries and damages as alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant him the

relief sought, including but not limited to actual and compensatory in excess of Seventy-

Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the

costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is

deemed just and equitable.


Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
SMOLEN & ROYTMAN
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

***Attorneys for Plaintiff***